UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

IVAN WARE & SON, INC.
d/b/a WARE, INC.                                                                           PLAINTIFF


v.                                                          CIVIL ACTION NO. 3:10-CV-00484-CRS


DELTA ALIRAQ, INC., et al.                                                        DEFENDANTS


**MEMORANDUM OPINION**

I.      Introduction

This case is before the court on defendants Delta Aliraq, Inc. ("Delta"), Kais Almarzouk

("Almarzouk") and Armando Dupont's ("Dupont") (collectively "Defendants") motion for

summary judgment. ECF No. 130. Plaintiff Ivan Ware & Son, Inc. ("Ware") responded, and

Defendants replied. ECF Nos. 135, 136. Ware subsequently moved for leave to file a sur-reply to

address new arguments in Defendants' reply. ECF No. 139. For the reasons set forth below,

Ware's motion for leave to file a sur-reply will be granted, and defendants' motion for summary

judgment will be granted in part and denied in part.

II.     Factual Background

The facts of this case were presented in detail in the memorandum opinion regarding

plaintiff's previous motion for summary judgment:

> Prior to May 2007, the Iraqi Ministry of Oil ("the Ministry") requested proposals
> to supply three boilers at the Iraqi government-owned South Oil Refinery near
> Basrah, Iraq. The Ministry sought a "turn key" project, which required the
> successful bidder to design and manufacture boiler components, produce spare
> parts, install the system, and provide engineering services and operational
> training. After the initial bid, the bid process mandated that the South Oil
> Refinery conduct a technical review of the project proposals. The South Oil

1

Refinery would then contingently award the project contract. After this initial award, the Ministry reviewed and determined whether to consent to and award the contract. The Ministry's award, however, was further conditioned on credit and bid bond requirements. Mem Op., ECF No. 105, pp. 1-2.

Delta, seeking to bid on this project, sent out requests for proposals ("RFPs") to several boiler providers, including Ware. ECF No. 130-2. Ware responded to Delta's RFP, quoting a price of $18,500,000 to $20,000,000. ECF No. 130-3. Delta relied on Ware's proposal in drafting its bid for the South Oil Refinery project. ECF No. 130-4. Ware then signed a letter of representation, stating that "Mr. Kais Almarzouk and Delta Aliraq are authorized to represent Ware for the sale of new boiler equipment in Iraq . . . for a period of six months from [May 9, 2007] prior to the contract[,] [which] will be extended through the life of the program if a purchase order/LC is placed with Ware." ECF No. 100-2, p. 1. The letter further stated that "[t]his notification of representation does not convey that a relationship other than that of an Independent contractor exists between the two companies." *Id.* During this time, communication on behalf of the companies was primarily between Delta's President and Chief Executive Officer ("CEO"), Kais Almarzouk, and Ware's Director of Sales, Steven Taylor.

South Oil Refinery initially rejected Delta's bid—as it failed to include certain required elements—but allowed the company to re-submit a revised bid. ECF No. 59-1, p. 88. Delta and Ware then jointly revised the bid and submitted it on August 18, 2007. ECF No. 130-5.

In its review of Delta's bid, South Oil Refinery sought additional information concerning Ware's financial integrity, as it had not previously worked with the company. ECF No. 59-1, pp. 99-100. Ware provided a financial statement written by two independent auditors. ECF No. 130-6. During the review period, a Delta employee learned from a government official associated with the South Oil Refinery project that there were concerns regarding Ware's participation. ECF No. 59-1, pp. 92-93. In October 2007, Delta sent a letter to the Ministry indicating that if Delta

were awarded the project, the Ministry could choose whether Ware or another company supplied the boilers. ECF No. 59-1, pp. 101-102. Delta never informed Ware that the Ministry had concerns about its participation, or that Delta told the Ministry it could ultimately choose the boiler supplier. *Id.* at 148-49. In fact, Delta told Ware that it was "good news" that the Ministry was investigating its financials because Delta wanted Ware "to stay the course." *Id.* Delta admits that during the bid review process, it received proposals from two of Ware's competitors—Nebraska Boiler and English Boiler—but these proposals were never submitted to the Ministry. ECF No. 100-5, p. 101.

During the bid review, Ware provided Delta with a $1.5 million bid bond from Fidelity and Deposit Company of Maryland. ECF No. 59-4. According to Ware, Delta requested that it provide this bid bond. ECF No. 11-1, ¶ 10. Delta contests this, stating that it never asked for Ware to provide a bid bond because the bond for the project was required to come from an Iraqi bank. ECF No. 59-1, p. 93-95. Delta ultimately submitted a bid bond to the Ministry. ECF No. 130-7.

On November 5, 2007, the South Oil Refinery awarded the project to Delta, conditioned upon Delta providing an additional three-month bank guarantee. ECF No. 130-8. Delta then informed Ware that it received the award for the project, but explained that it no longer had sufficient funding to cover the bid through the remaining review process. ECF No. 130-9. Delta requested that Ware provide it with a $100,000 loan. *Id.* at p. 4. On November 19, 2007, Ware responded to Delta's letter, providing a proposed equipment sales agreement and stating that Ware could not provide any funds until an agreement between the two parties was formalized. ECF No. 11-1, ¶ 13. Then, on December 16, 2007, Delta informed Ware that it had obtained the funding through two investors. *Id.* ¶ 14-15. Delta told Ware that it would need a final proposal

3

for the boilers, and informed Ware that there was a second project from the Ministry that the companies could partner on. *Id.* at ¶ 15. However, Delta never signed Ware's equipment sales agreement. *Id.*

From November 2007 to February 2008, Ware continued to work on formalizing details for the project with Delta. *Id.* at ¶ 16. During this time period, Delta continued to get negative feedback from the Ministry regarding Ware's participation in the project. ECF No. 100-5, p. 98. The Ministry was familiar with Ware's competitors, Nebraska Boiler and English Boiler, but was unfamiliar with Ware. *Id.* In response to this, Delta submitted a letter to the Ministry stating that it would be working with Ware, and vouching for Ware's business experience. ECF No. 55-10.

On May 25, 2008, the Ministry awarded Delta the contract for the project. ECF No. 130-13. However, two weeks later the Deputy Minister of the Ministry unilaterally changed the payment schedule for the award, requiring Delta to shoulder a greater cost burden during construction. ECF No. 130-15. Specifically, the modifications required a new performance bond equal to 5% of the purchase price. *Id.*

Delta contacted Ware regarding the contract for the project. ECF No. 130-16. Delta told Ware that it would like to enter a partnership with Ware, but that it had insufficient funds to complete the project. *Id.* Both Delta and Ware then began searching for alternative ways to fund the project. *Id.* During this time, Ware sent a letter of intent and another equipment sales agreement to Delta. ECF No. 130-17. Delta signed the letter of intent, but did not execute the equipment sales agreement. *Id.*

Despite efforts by both Delta and Ware, the companies were initially unable to secure financing for the project. As a last resort, Delta met with investor Dave Weisman to secure the funding for the project. Weisman agreed to provide the funds for the South Oil Refinery project

in exchange for 55% of the project's profits, return on investment funds, and a position as CEO. ECF No. 130-18.

Once positioned as CEO, Weisman requested boiler providers—including Ware, Nebraska Boiler, and English Boiler—re-submit proposals for the project. ECF No. 11-1, ¶ 28. Ware submitted a revised copy of its proposal in February 2009, which included its copyrighted technical proposal. ECF No. 130-20. At some point, Delta showed Ware's technical proposal to Nebraska Boiler without Ware's consent. ECF No. 130-21; ECF No. 100-5, p. 158. In April 2009, Delta—under Weisman's authority—executed a contract with Nebraska Boiler for the production of boilers for the project. ECF No. 130-24.

In 2012, Delta's Board of Directors voted to terminate Weisman as CEO based on his alleged embezzlement of funds from the corporation. ECF No. 100-5, pp. 121-22. Almarzouk subsequently resumed his position as CEO. As of May 2012, Delta had not completed the South Oil Refinery project because the company "r[an] out of money." *Id.* at 162.

Ware filed suit against Delta in this court, alleging fraud in the inducement, quantum meruit and unjust enrichment. ECF No. 1. Ware subsequently amended its complaint, adding Almarzouk and Dupont as co-defendants and adding claims for promissory estoppel, breach of fiduciary duty, and piercing the corporate veil. ECF No. 59. Defendants now move for summary judgment on all of Ware's claims. ECF No. 130.

### III.    Legal Standard

The trial court shall grant summary judgment in a case "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of "demonstrating that [there is] no genuine issue of material fact." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to "point to evidence demonstrating that there *is* a genuine issue of material fact for trial." *Id.* at 323 (emphasis added).

In considering a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There must actually be "evidence on which the jury could reasonably find for the [nonmoving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV.    Discussion

Defendants contend that they are entitled to summary judgment on all of Ware's claims. Specifically, Defendants argue that Ware has failed to demonstrate prima facie claims for fraud in the inducement, quantum meruit/unjust enrichment, promissory estoppel, and breach of fiduciary duty. Additionally, Defendants claim that Ware has not shown a need to pierce the corporate veil to extend liability to Almarzouk and Dupont in their individual capacities. These arguments will be addressed in further detail below.

### A. Count I: Fraud in the Inducement

Count I of Ware's amended complaint alleges that Delta defrauded Ware by making multiple oral misrepresentations and omissions "which caused Ware to provide Delta with Ware's technical expertise, legal counsel, contractors, team and copyrighted information." ECF No. 59, ¶¶ 85-86. Because the elements for fraud by misrepresentation are different than those

for fraud by omission, these claims will be considered separately. *Rivermont Inn v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003).

    i.  <u>Fraud By Misrepresentation</u>

In order to state a claim for fraud by misrepresentation, a plaintiff "must establish six elements by clear and convincing evidence: (a) material representation; (b) which is false; (c) known to be false or recklessly made; (d) made with inducement to be acted upon; (e) acted in reliance thereon; and (f) causing injury." *Farmers Bank & Trust Co. of Georgetown, Ky. v. Wilmott Hardwoods, Inc.*, 171 S.W.3d 4, *11 (Ky. 2005). A material representation "must concern an existing or a past fact, and not a future promise, prophecy, or opinion of a future event, unless [the] declarant falsely represents his opinion of a future happening." *Kentucky Elec. Dev. Co.'s Receiver v. Head*, 68 S.W.2d 1, *3 (Ky. Ct. App. 1934). Additionally, reliance on a material representation must be reasonable. *Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).

Defendants contend that Ware's claim against Delta for fraud by misrepresentation must fail because Ware has not demonstrated fraudulent intent or reasonable reliance. Ware, by contrast, argues that Delta intentionally or recklessly made false statements regarding its intention to use Ware's boilers for the South Oil Refinery project, and that it reasonably relied on those false representations. This court previously found that there were issues of material fact as to "whether Delta knew its assurances were false or made these assurances recklessly, and also whether Ware reasonably relied on Delta's assurances." Mem. Op., ECF No. 105, p. 5. Because Delta has not put forth any additional evidence as to these elements, the court maintains this conclusion.

A reasonable jury could find that Delta intentionally or recklessly made false representations to Ware. Delta—through Almarzouk—represented to Ware on several occasions that it would purchase the boilers for the South Oil Refinery project from Ware. Despite this, Almarzouk wrote a letter to the Ministry in October 2007 stating that the Ministry could choose to use boilers from Ware or another supplier. ECF No. 59-1, pp. 101-102. Additionally, Almarkzouk admitted that he knew the Ministry was investigating Ware's financials because it did not want Ware to be involved with the project, but told Ware that the investigation was "good news" in order to get Ware "to stay the course." ECF No. 59-1, p. 149. Nearly a year later, Delta signed a letter of intent with Ware, which stated that Delta "wish[ed] to purchase a turn-key boiler room from Ware." ECF No. 130-17, p. 5. Although this document stated that it was "non-binding," the parties *removed* a clause stating that "[t]he parties are not prevented from entering negotiations with other third parties," because "[t]his negates the premise behind a Letter of Intent." *Id.* However, during this time period, Delta continued to communicate with Ware's competitors regarding bids for the project. ECF No. 59-1, pp. 147-48.

Likewise, a jury could find that Ware reasonably relied on Delta's representations. Ware worked with Delta for over two years to acquire the South Oil Refinery project from the Ministry. ECF No. 11-1. Moreover, according to Ware, it was unaware that Delta received bids from or was communicating with Ware's competitors. *Id.* Based on these disputes of material fact, Delta is not entitled to summary judgment.

ii. Fraud By Omission

In addition to showing fraud by false representation, fraud can also occur by omission. To state a claim for fraud by omission, the plaintiff must demonstrate: "(a) that the defendant had a duty to disclose that fact; (b) that defendant failed to disclose that fact; (c) that the defendant's

failure to disclose the material fact induced the plaintiff to act; and (d) that the plaintiff suffered actual damages." *Rivermont Inn., Inc.*, 113 S.W.3d at 641 (citing *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127 (Ky. Ct. App. 1998)). "A duty to disclose facts is created only where a confidential or fiduciary relationship exists between parties, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts that created the false impression of full disclosure." *Id.* (citing *Dennis v. Thompson*, 43 S.W.2d 18 (Ky. Ct. App. 1931)).

The issue with respect to this case is whether Delta had a duty to disclose the Ministry's negative reaction to Ware's inclusion in the project. Defendants argue that Delta was not obligated to share this information with Ware. Ware disputes this, claiming that the "numerous deceptions and omissions" by Delta amounted to fraud. ECF No. 135, p. 10. Taking the facts in the light most favorable to Ware, the court finds that there is a genuine dispute of material fact that precludes summary judgment.

A reasonable jury could find that Delta had a duty to fully disclose the Ministry's negative reaction to including Ware in the project. When the South Oil Refinery was conducting its initial review of Delta's proposal, Delta employees were informed that the Ministry was skeptical about Ware's financial integrity. ECF No. 59-1, pp. 92-93. Rather than revealing this negative feedback to Ware, Delta told Ware that it was "good news" that the Ministry was conducting this financial review. *Id.* at 101-1-2. Delta continued to get "pushback" from the Ministry about Ware's participation in the project even after receiving the initial award. *Id.* It could be found that Delta's partial disclosure of this information created a duty to fully disclose. Based on this, Delta is not entitled to summary judgment on Ware's fraud in the inducement claim.

B. Count II: Quantum Meruit/Unjust Enrichment

Count II of Ware's amended complaint states claims for quantum meruit and unjust enrichment. To establish a claim for quantum meruit, a plaintiff must establish the following elements:

1) that valuable services were rendered;
2) to the person from whom recovery is sought;
3) the person accepted the services that were rendered; and
4) the person was reasonably notified that the party rendering the services expected to be paid by that person. *Realty Unlimited, Inc. v. Ball Homes, LLC*, 2009 WL 50179, *5 (Ky. Ct. App. 2009).

A claim for quantum meruit is "not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be recovery as if promises were made." *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987).

The sole element at issue is whether Delta was reasonably notified that Ware expected to be paid for its services. Defendants argue that Delta is entitled to summary judgment because Ware did not request any compensation for its services other than the potential award of a $20 million contract. Ware disputes this, claiming that both parties knew Ware intended to be compensated. Taking the facts in the light most favorable to Ware, the court finds that there is a genuine dispute of material fact as to this element.

A reasonable jury could find that Delta was on notice of Ware's intent to be paid for its services. Delta cites to *Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc.*, 242 S.W.3d 359 (Ky. Ct. App. 2007), for the proposition that a quantum meruit claim is not available when work is done in pursuit of a business opportunity rather than a cash payment. However, this case is distinguishable from *Quadrille*. Although Ware may have initially submitted a proposal to Delta in pursuit of a business opportunity, once Delta was awarded the project and the parties continued to work together, Delta was likely on notice that Ware expected

cash payment. Indeed, after Delta was awarded the project by the South Oil Refinery, Ware continued to submit more detailed plans for the project and work to obtain additional funding. ECF No. 11-1, ¶ 16. Further, the parties discussed milestones for the project and formed payment schedules, which were then submitted to the Ministry. ECF No. 130-27, ¶¶ 13-14. Thus, there is a dispute of material fact as to whether Delta was reasonably on notice that Ware expected to be paid for its work.

Ware's amended complaint also alleges unjust enrichment. To establish a claim for unjust enrichment, a plaintiff must demonstrate: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of [the] benefit by defendant; and (3) inequitable retention of [the] benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citing *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F.Supp. 1371, 1380-81 (W.D. Ky. Sept. 24, 1987)). Like quantum meruit, unjust enrichment is an equitable claim. *Id.*

Here, the only element at issue is whether Delta inequitably retained a benefit conferred by Ware without paying for its value. Based on the analysis above, a reasonable jury could conclude that Delta *did* inequitably retain such a benefit. Delta received the benefit of Ware's technical proposals and resources, but ultimately chose to use a different boiler provider after the contract had already been awarded. Delta is therefore not entitled to summary judgment on Ware's quantum meruit and unjust enrichment claims.

C. Count III: Promissory Estoppel

Count III of Ware's amended complaint states a claim for promissory estoppel. To establish a claim for promissory estoppel, a plaintiff must demonstrate: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided

11

only by enforcement of the promise." *Bergman v. Baptist Hosp. Sys., Inc.*, 344 F.Supp.2d 998, 1003 (W.D. Ky. July 28, 2004).

Defendants contend that Delta is entitled to summary judgment on Ware's promissory estoppel claim because there was no clear and definite promise, any such promise did not induce action or forbearance on the part of Ware, and Ware did not reasonably rely on any such promise. Ware disputes this, claiming that Delta made a promise to Ware that it would be included in the South Oil Refinery project, it continued to devote resources to the project as a result of those promises, and reliance on Delta's promises was reasonable. Viewing the facts in the light most favorable to Ware, the court finds that there are genuine issues of material fact precluding summary judgment on this claim.

A reasonable jury could find that Delta promised Ware it would be the boiler provider for the South Oil Refinery project. In November 2007, Delta sent Ware a letter indicating that "[t]he award [was] formally made to Delta" for the South Oil Refinery project. ECF No. 130-9, p. 2. It further requested an investment from Ware, and stated that Ware would "get a multi-million-dollar contract." *Id.* at 4. Delta also sent a letter to the Ministry—which Ware was aware of— stating that Ware would be the boiler provider for the project. ECF No. 130-11. Delta later signed a letter of intent, which stated that Delta "wishe[d] to purchase a turn-key boiler room from Ware." ECF No. 130-17.

Delta argues that the disclaimers in Ware's proposals show that no promise was made. The disclaimer states:

> Final negotiations and the terms and conditions of the letter of credit shall be accepted in writing by Ware prior to an acceptance of a formal contract and prior to proceeding on this project. ECF No. 55-7, p. 34.

This disclaimer does not demonstrate that Delta never made a promise. Rather, it demonstrates that no formal contract was reached between the parties. This is irrelevant. Under Kentucky law, a claim for promissory estoppel *only* lies where there is no enforceable contract. *Rivermont Inn, Inc.*, 113 S.W.3d at 642.

Delta further argues that it did not make a promise to Ware because Ware was merely a participant in a competitive bidding project. Although Delta did not make a promise to Ware while its proposal was pending before the South Oil Refinery, once Delta was awarded the project, it made promises to Ware that Ware would be the boiler provider.

Additionally, a reasonable jury could find that Ware relied on Delta's promises. Indeed, Steven Taylor, Ware's Director of Sales, stated that Ware spent nearly 2,110 hours working on the project after Delta indicated that Ware would be the boiler provider. ECF No. 130-27, p. 5. This time was spent "designing the boiler system, assembling vendors, and creating revised bids for Delta to submit to the South Oil Refinery." *Id.* Delta argues that Ware did not rely on its promise, as it submitted a third proposal even after Delta—under Weisman's authority—began accepting proposals from other providers in early 2009. However, much of Ware's work on the project occurred before this time. Thus, there is a dispute of material fact as to whether Ware relied on Delta's promise.

Further, a reasonable jury could find that Ware's reliance on Delta's promises was reasonable. This court previously determined that there was a dispute of material fact as to this element in its opinion regarding plaintiff's previous motion for summary judgment. Because Delta has not produced any additional evidence to demonstrate that such reliance was unreasonable, the court maintains this conclusion. For these reasons, Delta is not entitled to summary judgment on Ware's promissory estoppel claim.

13

D.  Count IV: Breach of Fiduciary Duty

Count IV of Ware's amended complaint states a claim for breach of fiduciary duty. To establish a claim for breach of fiduciary duty, a plaintiff must show: "(1) the defendant owes a fiduciary duty to the plaintiff; (2) the defendant breached that fiduciary duty; and (3) the plaintiff suffered damages as a result of that breach." *Insight Ky. Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016) (citing *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 665 (E.D. Ky. Feb. 26, 2009)). A 'fiduciary relationship' is defined as "one founded on trust or confidence reposed by one person in the integrity and fidelity of another" that necessarily requires "one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Center, Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Although a fiduciary relationship may be informal, the fiduciary must have "expressly undertaken to act for the plaintiff's primary benefit." *Flegles, Inc.*, 289 S.W.3d at 552. A fiduciary relationship is distinct from "the generalized business obligation of good faith and fair dealing." *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex. 1992)). Indeed, "[a] fiduciary relationship creates the highest order of duty imposed by law." *Id.*

The primary issue with respect to this claim is whether a fiduciary relationship existed between Delta and Ware. Defendants argue that Ware's claim fails as a matter of law because there was no fiduciary relationship between Delta and Ware. Ware, by contrast, claims that an informal fiduciary relationship was created when Delta agreed to represent Ware in obtaining the South Oil Refinery project and when Ware shared its intellectual property with Delta. Even considering the facts in the light most favorable to Ware, the court finds that Delta is entitled to judgment as a matter of law.

There is no evidence of a fiduciary relationship between Delta and Ware. The letter of representation executed by Delta and Ware before the proposal was submitted to the South Oil Refinery explicitly states that "this notification of representation does not convey that a relationship other than that of an Independent contractor exists between the two companies . . ." ECF No. 100-2, p. 2. The letter further states that Delta "may not at any time be authorized to sign on behalf of [sic] Ware contract documentation that would cause either party any obligation . . ." *Id.* Based on this language, neither party demonstrated an intent that Delta would act only for Ware's benefit.

Ware also points to emails between Delta and Ware in which Delta refers to a potential "partnership" between the parties. ECF No. 130-16, p. 3. However, these emails do not evince an understanding by Delta that it would be acting primarily for Delta's benefit. Rather, one of the emails states that there is "[n]o way Delta Aliraq can [be] success[ful] alone and no way Ware can win business in Iraq unless Ware and Delta Aliraq become partner[s]." *Id.* This shows that Delta continued to act in its own self-interest.

Ware further cites to *In re Sallee* for the proposition that courts are more likely to find fiduciary relationships where one party improperly uses the confidential information of another. 286 F.3d at 893. However, there is no evidence that Delta misused Ware's *confidential* information. Although Delta admits it shared Ware's copyrighted technical proposal with one of Ware's competitors, copyrighted materials are not *per se* confidential. *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412 (7th Cir. 2008). Ware has not provided any evidence as to specific aspects of the technical proposal that constitute trade secrets or confidential information. Because Ware fails to establish it had a fiduciary relationship with Delta, its claim for breach of fiduciary duty fails as a matter of law.

E.  Count V: Piercing the Corporate Veil to Almarzouk and Dupont

Count V of Ware's amended complaint alleges that liability for the aforementioned

claims should be extended to Almarzouk and Dupont in their individual capacities based on the

equitable doctrine of piercing the corporate veil. Although the "hallmark of a corporation" is the

limited liability of its shareholders, piercing the corporate veil makes the corporation's debt

"enforceable against those who have exercised dominion over the corporation to the point that it

has no real separate existence." *Inter-Tel Tech., Inc. v. Linn Station Prop.*, 360 S.W.3d 152, 155

(Ky. 2012).

Although courts are "reluctant to disregard the corporate entity," it is appropriate in some

instances. *Holsclaw v. Kenilworth Ins. Co.*, 644 S.W.2d 353, 355 (Ky. Ct. App. 1982). Courts

have traditionally used the 'alter ego' formulation in determining when to pierce the corporate

veil. The elements of the 'alter ego' formulation are:

1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and
2) that the facts are such that an adherence to the normal attributes, *viz*, treatment as a separate entity, of separate corporate existence would sanction a fraud or promote an injustice." *White v. Wincester*, 584 S.W.2d 56, 61-62 (Ky. Ct. App. 1979).

Another formulation commonly used by courts in assessing the need to pierce the corporate veil

is the 'instrumentality' formulation. The elements of the 'instrumentality' formulation are:

1) that the corporation was a mere instrumentality of the shareholder;
2) that the shareholder exercised control over the corporation in such a way as to defraud or harm the plaintiff; and
3) that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss. *Id.* at 61.

In *Inter-Tel Technologies, Inc. v. Linn Station Properties*, 360 S.W.3d at 165, the

Kentucky Supreme Court stated that "a trial court may proceed under the traditional alter ego

formulation or the instrumentality [formulation] because the tests are essentially

interchangeable." Both formulations ask whether there is "(1) domination of the corporation

resulting in loss of corporate separateness *and* (2) circumstances under which continued

recognition of the corporation would sanction fraud or promote injustice." *Id.* In assessing the

first factor, courts should look for evidence such as:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe
> corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor
> corporation; (6) nonfunctioning of the other officers or directors; (7) absence of
> corporate records; (8) comingling of funds; (9) diversion of assets from the
> corporation by or to a stockholder or other person or entity to the detriment of
> creditors; (10) failure to maintain arms-length relationships among related
> entities; and (11) whether, in fact, the corporation is a mere façade for the
> operation of the dominant shareholders." *Id.* at 163.

No one factor is dispositive. In assessing the second factor, "the trial court should state

specifically the fraud or injustice that would be sanctioned if the court declined to pierce the

corporate veil." *Id.* at 165.

Defendants argue that they are entitled to summary judgment on this issue, as Delta is not

liable for the underlying claims, and piercing the corporate veil is not an independent cause of

action.[1] Ware, by contrast, argues that there are pending claims against Delta, and there is

evidence showing that it is appropriate to pierce the corporate veil to impose liability on

Almarzouk and Dupont. Taking the facts in the light most favorable to Ware, the court finds that

there is a dispute of material fact as to Almarzouk's individual liability, but Dupont is entitled to

judgment as a matter of law.

---

[1] Defendants cite *Obipektin AG v. Falkon Intern, Inc.*, 2010 WL 411501 (W.D. Ky. Jan. 29, 2010) for the proposition that "piercing the corporate veil is not an independent cause of action . . . but an equitable remedy by which a creditor can impose liability on someone other than the party which is actually responsible." While it is true that piercing the corporate veil is not an independent cause of action, "[a] theory of liability that the corporate veil should be pierced must be plead in the complaint." *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F.Supp.2d 841, 847 (W.D. Ky. Sept. 26, 2007) (citing *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983)).

i. Piercing the Corporate Veil to Almarzouk

There is a dispute of material fact as to whether Ware can pierce the corporate veil to hold Almarzouk liable for Delta's debts. Almarzouk is both the CEO and a shareholder of Delta. ECF No. 59-1. As to the first element of piercing the corporate veil, there is evidence suggesting a lack of separateness between Almarzouk and Delta. Most significantly, there is evidence that Almarzouk comingled his personal funds with Delta's funds. In July 2009, Almarzouk received a $358.00 "advance" from Delta, despite claiming that he does not receive a salary as CEO. ECF No. 59-15. Additionally, in September 2010 Almarzouk wrote a $2,700.00 check from Delta's corporate account to Canyon Tax and Bookkeeping for "taxes for [Delta Aliraq]/personal." ECF No. 59-19. Moreover, Delta's 2010 balance sheet shows that Delta loaned Almarzouk $83,027.09. ECF No. 59-20, p. 5.

In addition to comingling funds, there is evidence that Almarzouk diverted assets from Delta. In 2012, Almarzouk sold Delta's building to his brother for $200,000 in order to pay off a promissory note. ECF No. 59-24. However, there is evidence that the value of the property was substantially higher than $200,000. Comparable real estate within a one mile radius of the building sold for prices between $530,000.00 and $2,662,500.00. ECF No. 55-24, pp. 9-10.

Moreover, there is evidence that Delta is insolvent. Delta's 2012 balance sheet shows that the corporation's liabilities were $955,092.02, while its assets were only $540,489.56. ECF No. 59-20, pp. 11-12.

The parties did not extensively brief the issue of piercing the corporate veil to Almarzouk. The evidence cited above is admittedly sparse. However, Ware's dealings with Delta were almost exclusively through Almarzouk. If Ware can show that Almarzouk created Delta as an 'alter ego' or 'instrumentality' of his own business interests, then piercing the corporate veil

to hold Almarzouk liable in his individual capacity may be appropriate. At this juncture, summary judgement is not appropriate.

    ii.   <u>Piercing the Corporate Veil to Dupont</u>

There is insufficient evidence to support piercing the corporate veil to hold Dupont liable for Delta's debts. Dupont serves as both a board member and a shareholder of Delta. ECF No. 59-1. The only evidence that Ware presents against Dupont is that Dupont was involved in the above-mentioned real estate transaction between Delta and Almarzouk's brother. ECF No. 59-23. This alone fails to demonstrate that there was a lack of separateness between Dupont and Delta such that the corporate veil must be pierced. Although Ware stated in its sur-reply that it anticipated obtaining additional evidence against Dupont after it took his deposition, this deposition has not been submitted to the court. ECF No. 139-1, p. 2. Accordingly, Ware's claims against Dupont in his individual capacity fail as a matter of law.

V.     <u>Conclusion</u>

For the reasons set forth above:

1) Ware's motion for leave to file a sur-reply will be granted.

2) Defendants' motion for summary judgment will be granted as to Ware's breach of fiduciary claim and claims extending liability to Dupont in his individual capacity.

3) Defendants' motion for summary judgment will be denied as to Ware's claims for fraud in the inducement, quantum meruit/unjust enrichment, promissory estoppel, and claims extending liability to Almarzouk in his individual capacity.

An order will be entered in accordance with this memorandum.

March 28, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**